UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS AT BOSTON

_____

CAROL THOMAS,

     Plaintiff,

-v-                                                    CIVIL NO. 05-10726 PBS

DRESSER, INC. – MASONEILAN

     Defendant.
_____

**PLAINTIFF'S OPPOSITION TO
DEFENDANT'S MOTION TO STAY PROCEEDINGS PENDING USE OF
MANDATORY DISPUTE RESOLUTION PROGRAM
(WITH INCORPORATED MEMORANDUM OF LAW)**

     Plaintiff hereby opposes the Defendant's Motion to Stay Proceedings

Pending Use of Mandatory Dispute Resolution Program.

**Background & Summary of Argument**

     Plaintiff was a former Human Resources Specialist of Dresser, Inc. and

alleges that the termination of her employment was racially motivated in violation

of Title VII of the Civil Rights Act of 1964, as amended, as well as Chapter 151B

of the Massachusetts General Laws.  Dresser argues that the entire claim should

be stayed pending the use of what it is calling a "mandatory" dispute resolution

program (DRP).

     Plaintiff opposes the motion on the grounds that the case law and the

facts do not support the Defendant's position, to wit, that there is no "mandatory"

dispute resolution program for employees in the Plaintiff's position (or even those similarly situated).[1]

## Argument

**1. Defendant cannot demonstrate that there is a valid agreement to arbitrate. [2]**

"A party seeking to stay proceedings….or to compel arbitration….must demonstrate 'that a valid agreement to arbitrate exists, that the movant is entitled to invoke the arbitration clause, that the other party is bound by that clause and that the claim asserted comes within the clause's scope." Campbell v. General Dynamics Government Systems Corporation, et al,, U.S. Court of Appeals for the First Circuit, No. 04-1828 (Decided May 23, 2005), at p. 13 (See Exhibit A); See also Rosenberg v. Merrill, Lynch, Pierce, Fenner & Smith, 170 F.3d 1 (1st Cir. 1999). In this case, the Defendant "can prevail on its demand for arbitration only if it can establish that the provision for mandatory arbitration is part of a valid contract within the purview of the FAA [and whether] the enforcement of the arbitration provision would be appropriate under [Title VII]." See Campbell v. General Dynamics Government Systems Corporation, at 19-20; see also Rosenberg v. Merril Lynch, Pierce, Fenner & Smith, Inc., 170 F.3d 1, 19 (1st Cir. 1999).

---

[1] Plaintiff also believes that the Motion is baseless and filed to delay the proceedings and cause the Plaintiff to incur great expense. She respectfully requests that the Defendant either be sanctioned or admonished for seeking this relief.

[2] For the purposes of this Opposition, the Plaintiff does not dispute that Title VII permits pre-dispute arbitration agreements. Rosenberg v. Merrill, Lynch, Pierce, Fenner & Smith, 170 F.3d 1, at 7-8 (1st Cir. 1999)

"The appropriates of enforcing an agreement to arbitration…..hinges on whether, under the totality of the circumstances, the employer's communications to its employees afforded 'some minimal level of notice' sufficient to apprise those employees that <u>continued employment would effect a waiver of the right to pursue the claim in a judicial forum."</u> <u>Id.,</u> at 19 [emphasis added]. "[T]he sufficient of notice turns on whether, under the totality of circumstances, the employer's communication would have provided a reasonably prudent employee notice of the waiver. This is an objective standard. <u>Id,</u> at 21 [citing <u>Rosenburg,</u> 170 F.3d at 21, n.17]. Defendant's documents do not support the contention.

### A.      Riegler's June 2001 Memorandum

The memorandum is touted as announcing the DRP with Dresser.[3] However, a careful reading of this memorandum does not anywhere use the term "mandatory." The memorandum states that as of July 1, 2001, Dresser's program will be operating independently from Halliburton and "in the months that follow" the employees will received written materials that "summarize the program feature." Most importantly, it does not command that employees read these documents, but rather merely "<u>encourage[s them]</u> to read the documents carefully, so that [employees] will be able to take full advantage of the programs benefits."

There is absolutely nothing in this document that in any way suggests that continued employment with Dresser amounts to an acceptance of this policy, or

---

[3]The DRP began when Dresser merged with Halliburton in 1998. However, even then, the DRP allied only to employees hired after the merger. See Affidavit of Carol Thomas, Exhibit A, paragraphs 3 and 4.

the waiver of seeking relief in a judicial forum.  See Id., at 26. The use of this

vocabulary undersells the significance of the obligations in the policy, and cannot

be considered as a means of communicating the important waiver to employees.

Id., at 28.


### B.     Reed's July 6, 2001 Memorandum

Again, like the June 2001 memorandum, the term "mandatory" or some

other synonym is missing from the document.  However, Reed states "[e]nclosed

you will find information on the Dresser, Inc. Dispute Resolution Program (DRP),

options for resolving work-related problems."  [Emphasis added].  The

memorandum also closes with "…..we are eager to provide options for resolving

differences."  [Emphasis added].  Dresser's choice of vocabulary downplays the

significance of the obligations and the waivers purportedly set forth in the Policy.

And once again, Reed does not demand that employees read the

documents, but only "encourage[s]" them to.  Nothing in the document clearly

states that continued employment constitutes a waiver and nothing suggests that

continued employment amounted to a waiver of access to a judicial forum."  See

Id., at 26.   "While explicitness may not be a *sine qua non* of an effective notice, it

would have gone a long way toward meeting the employer's burden."  Idl.


### C.     The Dispute Resolution Plan and Rules

On page one of the materials, it states that the Plan relates to "current,

former or potential employment" issues.   On p. 3, the plan defines "Employee"

as "any person who <u>is or has been in the employment of the Company on or after</u> <u>the effective date of this Plan</u>, whether or not employed at the time a claim is brought with respect to a Dispute….." The balance of the document sets forth the rules, none of which require elaboration for the purposes of the issues now before the Court.

### D.     Additional Materials: "Options for Resolution"

The very use of the term "options" erases any implication that the program offered by Dresser is mandatory.  There, for the first time, on page one the following language appears "[P]lease read this brochure carefully and keep it as a ready reference."

Finally, on page 5,  the following language appears: "….an employee who accepts or <u>continues employment at Dresser</u>, by accepting compensation for employment, agrees to resolve all claims against Dresser ….through this process rather than through the court system."

The problem with this material is that is assumes that employees are going to read it, after they have already been given two pieces of collateral material communicating "options" and several communications that utilize language that downplays the significance of the policy and the important waivers it represents by, among other things, only encouraging them to peruse the materials.  It is also fair to say that the use of the language on page 5, rather than on page 1, or on any of the other collateral material and communications only raises the specter that Dresser was trying to "sneak one by" its employees.

Taking this document, coupled with the others, Dresser cannot maintain that the waiver was voluntary and cannot legitimately claim that the requirement for Plaintiff to participate in the DRP is compulsory.

### E.    The Lack of Documentation and The Acknowledgement Form

By its own admission, Dresser required new hires to sign an acknowledgement of receipt of the DRP program.  Plaintiff readily concedes that this was required for all new hires, and among her job responsibilities was for her to obtain those signatures.   This is where this issue gets a little tricky:  Plaintiff maintains that participation in the DRP program was not compulsory for then current employees.  It was only compulsory for new hires   See Affidavit of Carol Thomas, Exhibit B.

In its motion, Dresser provided a "Dispute Resolution Program Agreement" acknowledgment form.  The form clearly states that the plan had an effective date of April 10, 2001.  Based on the materials submitted by the Defendant that purports to confirm the existence of that plan, news of the plans implementation was not provided until June of 2001, and materials were provided in July of 2001.  There is no way than an employee could know that continued employment as of April 10, 2001 constituted a waiver of access to a judicial forum.

Curiously lacking from Dresser's arguments is any explanation as to why they have no acknowledgment signed by Plaintiff.   "Requiring an affirmative response of that sort would have signaled that the Policy was contractual in

nature." <u>Id., at</u> 25.  The acknowledgment states that if the employee "chooses to accept employment <u>or continue employment with any Dresser, Inc. company</u>" [emphasis added] he or she is subject to the policy.  Indeed, if Dresser wanted to preserve its position to have Plaintiff's participated in the DRP compulsory, its legal department could – and frankly should – have sent a memo to Plaintiff requesting that she, among others sign it.

But as Plaintiff explains in her affidavit, and as the Human Resource Specialist for the company she is in one of the best positions to know this fact, the policy was not required for current employees of Dresser.  See Affidavit of Carol Thomas, Exhibit B.  The DRP was mandatory only for new hires.

Plaintiff's beliefs coupled with the Dresser's failure to pursue a signed acknowledgment make "it less likely that the communication [of the mandatory program] would spark the realization that the new Policy marshaled binding effects." <u>Id</u>.,  at 25.

## **Conclusion**

It is for all these reasons that the Defendant's Motion to Stay Proceedings Pending Use of Mandatory Dispute Resolution be denied, and that the Court enter any additional relief that it deems equitable, just and proper.

Respectfully submitted:

THE PLAINTIFF
Carol Thomas
By her attorney:

DATED:    June 24, 2005

_____/s/ William J McLeod
William J. McLeod, BBO 560572
McLeod Law Offices, PC
77 Franklin Street
Boston, MA  02110
617-542-2956/phone
617-695-2778/fax
wjm@mcleodlawoffices.com

# United States Court of Appeals
## For the First Circuit

No. 04-1828

RODERICK CAMPBELL,
Plaintiff, Appellee,

v.

GENERAL DYNAMICS GOVERNMENT SYSTEMS CORPORATION AND
RICHARD T. SCHNORBUS,
Defendants, Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nancy Gertner, U.S. District Judge]

Before

Selya, Lipez and Howard, Circuit Judges.

Arthur G. Telegen, with whom Claudia T. Centomini, Christopher J. Powell, and Foley Hoag LLP were on brief, for appellants.
Ann Elizabeth Reesman and McGuiness Norris & Williams, LLP on brief for Equal Employment Advisory Council, amicus curiae.
Martin J. Newhouse, Andrew R. Grainger, and Ben Robbins on brief for New England Legal Foundation, amicus curiae.
John N. Lewis, with whom Lawrence R. Mehl and John N. Lewis & Associates were on brief, for appellee.
Elizabeth E. Theran, Attorney, with whom Eric S. Dreiband, General Counsel, Lorraine C. Davis, Acting Associate General Counsel, and Vincent J. Blackwood, Assistant General Counsel, were on brief, for Equal Employment Opportunity Commission, amicus curiae.

May 23, 2005

**SELYA**, <u>**Circuit Judge**</u>.    This appeal calls upon us to consider the enforceability of a mandatory arbitration agreement, contained in a dispute resolution policy linked to an e-mailed company-wide announcement, insofar as it applies to employment discrimination claims brought under the Americans with Disabilities Act (ADA).    Our analysis turns on whether the employer provided minimally sufficient notice of the contractual nature of the e-mailed policy and of the concomitant waiver of an employee's right to access a judicial forum.    Weighing all the attendant circumstances, we conclude that the notice was wanting and that, therefore, enforcement of the waiver would be inappropriate. Consequently, we uphold the district court's denial of the employer's motion to stay proceedings and compel the employee to submit his claim to arbitration.

## I.  BACKGROUND

For a period of nearly three years, plaintiff-appellee Roderick Campbell toiled as an at-will employee of General Dynamics Government Systems Corporation.[1]    Starting on June 6, 2000, the plaintiff held a full-time, salaried position.

---

[1]During the times relevant to this case, the plaintiff's direct employer was General Dynamics C4 Systems, a business unit of General Dynamics Government Systems Corporation. General Dynamics C4 Systems has since reorganized as a separate corporation. These organizational minutiae need not concern us, so we use the appellation "General Dynamics" to refer collectively to both companies.

On April 30, 2001, at 1:54 p.m., General Dynamics sent an e-mail announcement to its entire work force regarding the implementation of a new dispute resolution policy (the Policy). The tag line of the e-mail indicated that the sender was "Broadcaster, NDHM [NDHM.Broadcaster@GD-NS.Com]" and its subject heading read "G. DeMuro œ New Dispute Resolution Policy." The message consisted of a page-long letter from Gerard DeMuro, the president of General Dynamics. In the introductory paragraphs, DeMuro pointed out that General Dynamics was "a leader in a very competitive marketplace," that its success depended on its employees, and that it was committed to "open, forthright and honest communication," especially in the context of "addressing and resolving employee issues concerning legally protected rights and matters." Subsequent paragraphs explained that the company had developed the Policy as a means to handle legal issues arising out of workplace disputes. The e-mail then limned the Policy's four-step approach to dispute resolution, describing the last step as "[a]rbitration by a qualified and independent arbitrator."

The e-mail made no mention of whether (or how) the Policy would affect an employee's right to access a judicial forum with respect to workplace disputes. Moreover, it neither specified that the Policy contained an agreement to arbitrate that would become binding upon continued employment nor indicated whether the term "workplace disputes" included those giving rise to federal

-3-

statutory claims.  The text of the Policy was not part of the e-mail proper, although the company posted the Policy on its intranet (its internal corporate network).

The e-mail did state that the Policy would become effective on May 1, 2001 (the day following its transmission).  It also urged recipients to "review the enclosed materials carefully, as the [Policy] is an essential element of your employment relationship."  Those with questions were invited to contact the company's vice-president of human resources.

The phrase "enclosed materials" was an apparent reference to two embedded links located at the bottom of the e-mail.  Each link provided access to a document that the recipient could view by moving a cursor over the link and clicking on it.  The first link was labeled "Brochure: http://csconnect.gd-cs.com/hr/dispute_resolution.htm"; clicking on it would have provided access to a two-page brochure that detailed how the Policy worked.  Upon reading the second page of that brochure, the recipient would have learned that company employees who "continue [their] current employment after the effective date of the [Policy's] adoption" would be "covered" by its terms and that the Policy would encompass, among other things, "[e]mployment discrimination and harassment claims, based on, for example, age, race, sex, religion, national origin, veteran status, citizenship, disability or other characteristics protected by law."  In a shaded

-4-

box in the lower right-hand corner of that page, the recipient
would have found the following statement:

> The Company has adopted this four-step policy
> as the exclusive means of resolving workplace
> disputes for legally protected rights.  If an
> employee files a lawsuit against the Company,
> the Company will ask the court to dismiss the
> lawsuit and refer it to the [Policy].

Clicking on the second link, entitled "Handbook:
http://csconnect.gd-cs.com/hr/DRP_Handbook_2.doc," would have
provided access to a dispute resolution handbook, which contained
the full text of the Policy (designated as "Human Resources Policy
402"), a flow chart illustrating how the Policy worked, forms for
filing claims at each of the four levels, and a compendium of
questions that the company thought might arise.

No part of the e-mail communication required a response
acknowledging receipt of the Policy or signifying that a recipient
had read and understood its terms.  Although General Dynamics set
up a tracking log to monitor whether each of its employees opened
the e-mail œ the record indicates that the plaintiff opened the e-
mail two minutes after it was sent œ it did not take any steps to
record whether its employees clicked on the embedded links to
peruse either the brochure or the handbook.  Moreover, General
Dynamics has not supplied any evidence to contradict the
plaintiff's claim that he never read or saw the brochure, the
handbook, or the Policy prior to his termination.

## II.  TRAVEL OF THE CASE

On December 30, 2002, General Dynamics terminated the plaintiff's employment on account of persistent absenteeism and tardiness.  Alleging that these infractions (and, hence, his dismissal) stemmed from a medical condition known as sleep apnea that General Dynamics should have accommodated, the plaintiff filed an administrative complaint with the proper agency charging discrimination on the basis of disability.  He later withdrew that complaint and sued General Dynamics in a Massachusetts state court under the ADA, 42 U.S.C. ⎯ 12101-12213, and Mass. Gen. Laws ch. 151B, ⎯ 4.[2]

General Dynamics removed the action to the federal district court.  See 28 U.S.C. ⎯ 1331, 1367, 1441.  It thereupon filed an answer in which it asserted, among other things, that the court could not try the plaintiff's claims because they were subject to resolution under the Policy.  To give teeth to this defense, the company invoked the Federal Arbitration Act (FAA), 9 U.S.C. ⎯ 1-16, and moved to stay the court proceedings and compel the plaintiff to submit his claims to arbitration.  See id. ⎯ 3, 4.  In an accompanying memorandum, it contended that the Policy forged an enforceable agreement to arbitrate all employment-related

_____

[2]The suit named Richard T. Schnorbus, the company's human resources manager, as a codefendant.  Since Schnorbus's presence adds nothing to the shape of the issues on appeal, we refer throughout to General Dynamics as if it were the sole defendant.

claims and maintained that the Policy's four-step framework was the
exclusive means for resolution of the plaintiff's claims.

The plaintiff opposed that motion, moved to strike the
company's affirmative defense,[3] and asked the court to impose
sanctions. His opposition posited (i) that an e-mail communication
is not a writing and, therefore, the Policy did not satisfy the
"written provision" requirement of 9 U.S.C. ¯ 2 and (ii) that, in
all events, the Policy was unenforceable because the company's e-
mail communication had failed to give the plaintiff adequate notice
that the Policy was intended to form a binding agreement to
arbitrate.

In response, General Dynamics submitted the affidavit of
the plaintiff's supervisor, John A. Sawyer. Sawyer vouchsafed that
the plaintiff performed most of his work on a computer and was
accustomed to sending and receiving e-mail communications. He also
averred that he periodically reminded the plaintiff that he was
responsible for knowing, understanding, and complying with company
policies, and that he could access those policies on the
"Connections" section of the company's intranet. In a companion

---

[3]The plaintiff's motion did not specify which of the eight
affirmative defenses alleged in the answer it sought to strike. In
ruling on the motion, the district court treated it as a request to
strike the third affirmative defense, in which General Dynamics had
asserted that "[a]ll counts of Plaintiff's Complaint are subject to
the dispute resolution procedure of [the] Policy, and therefore
cannot be tried by this Court." Neither side has complained about
this sensible reading of the record, so we follow the district
court's lead.

affidavit, the company's vice-president of human resources, Anne R. Harris, related that DeMuro typically sent three to five e-mails per year to the work force as a whole and that those e-mails generally were of company-wide significance.  Harris opined that employees would consider correspondence from DeMuro to be important and would review those materials thoroughly.

Not to be outdone, the plaintiff authored and submitted two counter-affidavits.  The first acknowledged his daily use of e-mail via the company's intranet, but observed that in an average day he was inundated with between ten and one hundred e-mails.  He made the further point that no documents in his personnel file in any way referred to the Policy.  The second affidavit emphasized that the plaintiff was never informed that General Dynamics might alter the terms of his employment by e-mail communications, that broadcast e-mails should be regarded as significant, or that he was required to read such e-mails to keep abreast of the terms and conditions of his employment.  The plaintiff stated that all matters affecting his employment were handled by the company's human resources department, commemorated in signed writings, and included in his personnel file.  None of those compiled documents mentioned the Policy.

The district court determined that the company's efforts to notify the plaintiff about the Policy were insufficient to extinguish his right to a judicial forum vis-è-vis his disability

-8-

discrimination claims.  See Campbell v. Gen. Dynamics Gov't Sys. Corp., 321 F. Supp. 2d 142, 145, 149 (D. Mass. 2004).  Accordingly, it denied the motion to stay proceedings and compel arbitration. Id. at 150.

In reaching those conclusions, the court focused on the characteristics of e-mail as a form of notification and declared that "a mass email message, without more, fails to constitute the minimal level of notice required" to enforce an agreement to arbitrate ADA claims.  Id. at 149.  The court added that the Policy could not be enforced under Massachusetts contract law because the plaintiff lacked knowledge of the offer and, therefore, any apparent acceptance of the terms of the Policy that might otherwise be inferable from his continued employment was nugatory.  See id. at 147 n.3.  Because it viewed the inadequacy of notice as dispositive, the court declined to reach the question of whether an electronic communication can constitute a written agreement within the purview of the FAA.  See id. at 150.  In a separate order, the court struck the related affirmative defense, see supra note 3, and denied the plaintiff's request for sanctions.

General Dynamics now appeals both the denial of its motion to stay proceedings and compel arbitration and the order striking its affirmative defense.  The district court has stayed the proceedings below pending the resolution of this interlocutory appeal.

## III.  APPELLATE JURISDICTION

We start our analysis with a jurisdictional inquiry.  In the absence of special circumstances, interlocutory orders are not immediately appealable.  See Roque-Rodriguez v. Lema Moya, 926 F.2d 103, 104-05 (1st Cir. 1991); see also 28 U.S.C. ¯ 1291.  The FAA creates statutory exceptions to the final judgment rule with respect to orders refusing stays under section 3, see 9 U.S.C. ¯ 16(a)(1)(A), and orders denying petitions to compel arbitration under section 4, see id. ¯ 16(a)(1)(B).  On this basis, it is evident that we have jurisdiction to review, here and now, the lower court's denial of the company's motion to stay proceedings and compel arbitration.  See Marie v. Allied Home Mortg. Corp., 402 F.3d 1, 6 (1st Cir. 2005).

The order striking the company's affirmative defense is, however, a horse of a different hue.  This order has no footing within the FAA's cache of statutory exceptions to the final judgment rule.  It is not a ruling denying a motion under section 3 or section 4 of the FAA and, therefore, does not trigger jurisdiction under section 16(a)(1).  Nor does this order fall within the FAA's catchall provision for the review of final judgments, 9 U.S.C. ¯ 16(a)(3), because it does not "end[] the litigation on the merits and leave[] nothing more for the court to do but to execute the judgment."  Green Tree Fin. Corp. v. Randolph, 531 U.S. 79, 86 (2000) (internal quotation marks

omitted).  Since section 16(a) clearly enumerates the types of orders covered by the FAA's various jurisdictional shelters, we decline to treat that provision as a general mechanism permitting the immediate appeal of any order hostile to arbitration.  Accord Bombardier Corp. v. Nat'l R.R. Passenger Corp., 333 F.3d 250, 254 (D.C. Cir. 2003).

Nor does the fact that we have appellate jurisdiction, in advance of any final judgment, over the district court's refusal to stay proceedings and compel arbitration give us the authority to reach out and review other rulings that are not immediately appealable.  See Limone v. Condon, 372 F.3d 39, 51 (1st Cir. 2004) (explaining that the exercise of pendent appellate jurisdiction requires, at a bare minimum, a demonstration "either that the pendent issue is inextricably intertwined with the issue conferring the right of appeal or that review of the pendent issue is essential to ensure meaningful review of the linchpin issue").  This means, then, that there is no principled way for us to assert jurisdiction over the order granting the motion to strike.  See, e.g., Morales Feliciano v. Rullén, 378 F.3d 42, 48 n.3 (1st Cir. 2004) (rejecting entreaty to exercise pendent appellate jurisdiction).

That ends this aspect of the matter.  The burden of establishing jurisdiction rests with the party who asserts its existence.  See Viqueira v. First Bank, 140 F.3d 12, 16 (1st Cir.

1998).  Because General Dynamics has failed to identify a valid jurisdictional hook on which we might hang immediate review of the grant of the plaintiff's motion to strike, that issue is not properly before us.

**IV.  THE MERITS**

We proceed to review the district court's denial of the motion to stay proceedings and compel arbitration.  That order reflects an essentially legal conclusion and, thus, warrants plenary review.  See Bercovitch v. Baldwin Sch., Inc., 133 F.3d 141, 147 (1st Cir. 1998); McCarthy v. Azure, 22 F.3d 351, 354 (1st Cir. 1994).  In conducting our inquiry, "[w]e are not wedded to the lower court's rationale, but, rather, may affirm its order on any independent ground made manifest by the record."  Intergen N.V. v. Grina, 344 F.3d 134, 141 (1st Cir. 2003).

Congress passed the FAA to overcome a history of judicial hostility to arbitration agreements.  See Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 24 (1991).  Its aim was to "place such agreements upon the same footing as other contracts."  Allied-Bruce Terminix Cos. v. Dobson, 513 U.S. 265, 271 (1995) (internal quotation marks omitted). As enacted, the FAA promotes a liberal federal policy favoring arbitration and guarantees that "[a] written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract

or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. ‾ 2.

Section 3 of the FAA, 9 U.S.C. ‾ 3, affords a mechanism by which a party can request a court to stay a judicial proceeding when the matter before the court involves an issue governed by an agreement to arbitrate.  Section 4, 9 U.S.C. ‾ 4, allows a party aggrieved by another party's refusal to arbitrate to petition a district court to compel arbitration in accordance with the parties' preexisting agreement.  A party seeking to stay proceedings under section 3 or to compel arbitration under section 4 must demonstrate "that a valid agreement to arbitrate exists, that the movant is entitled to invoke the arbitration clause, that the other party is bound by that clause, and that the claim asserted comes within the clause's scope."  <u>Intergen</u>, 344 F.3d at 142.  The need for such a showing follows from the bedrock principle that "a party seeking to substitute an arbitral forum for a judicial forum must show, at a bare minimum, that the protagonists have agreed to arbitrate <u>some</u> claims."  <u>McCarthy</u>, 22 F.3d at 354-55.

In this appeal, the parties dispute the most abecedarian of the four elements:  whether a valid agreement to arbitrate exists.  This element recognizes that, "[t]hough a person may, by contract, waive his or her right to adjudication, <u>see</u> 9 U.S.C. ‾ 2,

-13-

there can be no waiver in the absence of an agreement signifying an assent." Id. at 355.  In this vein, "arbitration is a matter of contract," AT&T Techs., Inc. v. Communications Workers, 475 U.S. 643, 648 (1986) (quoting United Steelworkers v. Warrior & Gulf Navig. Co., 363 U.S. 574, 582 (1960)), and for the most part, general principles of state contract law control the determination of whether a valid agreement to arbitrate exists, see Perry v. Thomas, 482 U.S. 483, 492 n.9 (1987) ("[S]tate law, whether of legislative or judicial origin, is applicable if that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally."); see also Mirra Co. v. Sch. Admin. Dist. #35, 251 F.3d 301, 304 (1st Cir. 2001); Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 170 F.3d 1, 19 (1st Cir. 1999).

When a party relies on the FAA to assert a contractual right to arbitrate a claim arising under a federal employment discrimination statute, the court must undertake a supplemental inquiry œ one that may overlap with the standard contract analysis, but is independent of it.  That supplemental inquiry grows out of the principle that while federal statutory claims can come within an arbitration agreement that is enforceable pursuant to the FAA, some federal statutory claims may not be appropriate for arbitration.  Gilmer, 500 U.S. at 26.  Thus, the supplemental inquiry focuses on whether the agreement to arbitrate is

-14-

enforceable with respect to the particular statutory claim at issue (here, the plaintiff's ADA claim).  In sieving these sands, the burden is on the party resisting arbitration to show (by means of statutory text, legislative history, or some inherent conflict between arbitration and the statute's purposes) that Congress, in enacting a particular statute, intended to preclude a waiver of a judicial forum for certain statutory claims.  See id.

We applied these principles in Bercovitch, where we rejected the plaintiffs' contention that their ADA claims were beyond the reach of the FAA.  See Bercovitch, 133 F.3d at 149-51. In arriving at that conclusion, we found that the plaintiffs had not carried their burden because nothing in the text or legislative history of the ADA indicated an intent to preclude arbitration. Id.  To the contrary, the ADA expressly endorses arbitration by providing that "[w]here appropriate and to the extent authorized by law, the use of alternative means of dispute resolution, including . . . arbitration, is encouraged to resolve disputes arising under this Act."  42 U.S.C. ¯ 12212.  In fine, the text of the ADA leaves no doubt that Congress contemplated arbitral resolution of at least some claims brought thereunder.  Bercovitch, 133 F.3d at 151.

Although Bercovitch solved a part of the puzzle in finding that the ADA did not necessarily prohibit enforcement of a waiver of a right to a judicial forum, the question remained whether agreements involving such waivers are enforceable as long

as they meet the requirements of the FAA or, alternatively, whether section 12212 should be understood to impose a further, independent limitation on the enforceability of such agreements.  That inquiry has come to focus on the bearing, if any, of the clause "[w]here appropriate and to the extent authorized by law," 42 U.S.C. 12212, on the enforceability of agreements to arbitrate ADA claims. In <u>Wright</u> v. <u>Universal Maritime Service Corp.</u>, 525 U.S. 70 (1998), the Supreme Court gave force to the word "appropriate" in section 12212 by finding that it would not be appropriate, within the meaning of that word, to enforce an agreement to arbitrate employment discrimination claims, contained in a collective bargaining pact, where a union's waiver of employee rights was not "clear and unmistakable."  <u>Id.</u> at 82 & n.2.  In articulating that standard, the Court expressly declined to consider whether to extend it to individual waivers and refrained from commenting on the meaning of the word "appropriate" in the latter context.  <u>See id.</u>

    In <u>Rosenberg</u>, this court addressed that interpretive question in considering the effect of identical language found in the Civil Rights Act of 1991 on the enforceability of individual agreements to arbitrate certain employment discrimination claims.[4]

---

[4]Although <u>Rosenberg</u> involved a claim arising under Title VII, its interpretation of the term "appropriate" is fully applicable here.  For one thing, the provision examined in <u>Rosenberg</u> œ section 118 of the Civil Rights Act of 1991 œ mirrors the language found in the ADA.  <u>Compare</u> Civil Rights Act of 1991, Pub. L. No. 102-166,

-16-

See Rosenberg, 170 F.3d at 18-19.  The Rosenberg majority reasoned that, at the very least, the words "to the extent authorized by law" must mean that civil rights statutes are no more permissive than the FAA in enforcing agreements to arbitrate; that is, "arbitration agreements that are unenforceable under the FAA are also unenforceable when applied to claims under [such statutes]." Id. at 19.  The majority deemed it unnecessary to decide whether that clause carries "a meaning greater than a reference to the FAA," id., and instead focused on Congress's concern that agreements to arbitrate be enforced only when it would be "appropriate" to do so, id. at 19-21.  Noting that the word "appropriate" conveyed "a concern not expressed in the FAA or at common law," id. at 19, the Rosenberg majority interpreted that word as prompting an additional, independent inquiry into the appropriateness of restricting access to a judicial forum or of compelling arbitration in a particular federal statutory case,[5] id.

_____

118, 105 Stat. 1071, 1081 (1991) (reprinted at 42 U.S.C. ⁻ 1981 note), with 42 U.S.C. ⁻ 12212.  For another thing, section 118 by its own terms applies to "provisions of federal law amended by [the Civil Rights Act of 1991]."  Civil Rights Act of 1991, ⁻ 118, 105 Stat. at 1081.  Because that legislation amended certain sections of the ADA, section 118 applies directly to the ADA.  See id. ⁻ 109, 105 Stat. at 1077 (amending sections 101(4) and 102 of the ADA).

   [5]The dissenting member of the Rosenberg panel questioned the majority's conclusion that the word "appropriate" demands an inquiry into the circumstances surrounding the formation of an arbitration agreement.  Rosenberg, 170 F.3d at 22 (Wellford, J., concurring in part and dissenting in part).  By the same token, other courts have not flocked to adopt Rosenberg's reading of the

at 20. The majority then found that enforcing the arbitration agreement as to Rosenberg's Title VII claim would not be appropriate under the circumstances attendant to the formation of that agreement. See id. at 19-21.

The appropriateness analysis is case-specific. In Rosenberg, the plaintiff, upon accepting a trainee position with the defendant, had signed a standard securities industry form, known as a U-4, which contained an agreement to arbitrate certain employment-related claims. Id. at 3. In lieu of specifying what kinds of claims were covered, the U-4 form incorporated by reference the rules of various securities organizations but did not indicate whether those rules covered all disputes (or any disputes). Id. at 18. The employer, despite promising to do so,

---

word "appropriate." See, e.g., Haskins v. Prudential Ins. Co., 230 F.3d 231, 241 (6th Cir. 2000) (noting that "[i]t is not clear how Congress intended the term 'appropriate' to apply in arbitration cases" and therefore finding it "unwise to require a heightened standard that arbitration be 'appropriate' without a clear Congressional requirement to do so, especially in light of the strong federal policy favoring arbitration"); Seus v. John Nuveen & Co., 146 F.3d 175, 183 (3d Cir. 1998) (finding it "most reasonable" to read the clause "where appropriate and to the extent authorized by law" as a hortatory provision referring to the FAA); see also Gold v. Deutsche Aktiengesellschaft, 365 F.3d 144, 149 (2d Cir. 2004) (declining to adopt Rosenberg's interpretation of the term "appropriate" in the context of an arbitration clause contained in a securities employment registration form). But see Haskins, 230 F.3d at 241 (Cole, J., dissenting) (commending the Rosenberg approach); Prudential Ins. Co. v. Lai, 42 F.3d 1299, 1305 (9th Cir. 1994) (holding that the word "appropriate" in the statute tends to limit the enforcement of arbitration provisions to situations in which the plaintiff "has knowingly agreed to submit such disputes to arbitration").

-18-

never supplied Rosenberg with a copy of the applicable rules, nor did it adduce evidence that she had been made familiar with them. Id. at 20.  Because (i) the U-4 form did not on its face indicate that the agreement to arbitrate extended to all employment disputes and (ii) the employer had neglected to familiarize Rosenberg with the rules delineating coverage despite its express promise to do so, the majority found it inappropriate to impress the provision requiring arbitration on Rosenberg's Title VII claim.  See id.; see also id. at 21 (relying upon Wright, 525 U.S. at 82 n.2, for the proposition that the appropriateness requirement "has some teeth"). In so holding, the Rosenberg majority determined that the employer must afford "some minimal level of notice to the employee that statutory claims are subject to arbitration" in order for arbitration to be deemed appropriate.  Id. at 21.

While Rosenberg's application of the appropriateness standard is fact-dependent, we are bound by the majority's recognition that this statutory term has some independent bite. Accordingly, we must inquire whether General Dynamics's e-mail announcement of the Policy provided sufficient notice to the plaintiff that his continued employment would constitute a waiver of his right to litigate any employment-related ADA claim, thereby rendering judicial enforcement of that waiver appropriate.

Viewed against this backdrop, General Dynamics can prevail on its demand for arbitration only if it can establish that

-19-

the provision for mandatory arbitration is part of a valid contract within the purview of the FAA and this court finds that the enforcement of the arbitration provision would be appropriate under the ADA. These are independent, yet overlapping, issues. The district court focused on whether the agreement was enforceable under the ADA and the parties have devoted the lion's share of their argumentation to that point. Consequently, we turn first to the question of appropriateness. Assuming, for argument's sake, that the arbitration agreement is a valid contract under general principles of Massachusetts law,[6] we inquire whether 42 U.S.C. ‾ 12212, which recognizes agreements to arbitrate ADA claims only where doing so would be appropriate, precludes the enforcement of the agreement.

The appropriateness of enforcing an agreement to arbitrate an ADA claim hinges on whether, under the totality of the circumstances, the employer's communications to its employees afforded "some minimal level of notice" sufficient to apprise those employees that continued employment would effect a waiver of the right to pursue the claim in a judicial forum. See id. at 21. In many cases, an employer will be able to satisfy this relatively light burden by producing evidence demonstrating that the employee

_____

[6]The parties do not dispute the district court's seemingly reasonable application of Massachusetts law, and we are free to accept their implicit concession. See Mathewson Corp. v. Allied Marine Indus., Inc., 827 F.2d 850, 853 n.3 (1st Cir. 1987).

had actual notice of the agreement. See generally Gibson v. Neighborhood Health Clinics, Inc., 121 F.3d 1126, 1130 (7th Cir. 1997). Here, however, General Dynamics did not bother to elicit from any employee an affirmation that he or she had read the e-mail (much less the Policy) or that he or she had become aware that arriving for work the next morning would constitute binding acceptance of a new contractual term replacing court access with arbitration. For his part, the plaintiff steadfastly maintains that he neither read the transmittals nor learned of the purported waiver of his right to litigate until General Dynamics tried to shunt his claims to arbitration. At this stage of the proceedings, then, there is no basis for a compelled finding of actual notice.

Accordingly, the sufficiency of the notice turns on whether, under the totality of the circumstances, the employer's communication would have provided a reasonably prudent employee notice of the waiver. This is an objective standard. See Rosenberg, 170 F.3d at 21 n.17. Factors relevant to this analysis include, but are not limited to, the method of communication, the workplace context, and the content of the communication.

As an initial matter, this case requires us to consider the proper weight that the choice of a mass e-mail as a means of communication bears on this multi-factor inquiry. The district court sharply discounted General Dynamics's case based on its use of this particular medium. See Campbell, 321 F. Supp. 2d at 148-

49. We question the extent of that discount; in our view, an e-mail, properly couched, can be an appropriate medium for forming an arbitration agreement. Withal, we do not read the district court's opinion as holding to the contrary œ that would be incorrect œ but as enumerating several ways in which General Dynamics readily and inexpensively could have made this particular e-mail notice more informative. See id. at 149. We nonetheless acknowledge that the district court's opinion does exhibit a high degree of skepticism about the use of e-mail in this context. We do not share that skepticism: we easily can envision circumstances in which a straightforward e-mail, explicitly delineating an arbitration agreement, would be appropriate.

In all events, the Electronic Signatures in Global and National Commerce Act (E-Sign Act), Pub. L. No. 106-229, 114 Stat. 464 (2000) (codified at 15 U.S.C. ⎯ 7001-7031), likely precludes any flat rule that a contract to arbitrate is unenforceable under the ADA solely because its promulgator chose to use e-mail as the medium to effectuate the agreement. The E-Sign Act provides in pertinent part:

> Notwithstanding any statute, regulation, or other rule of law (other than this subchapter and subchapter II of this chapter), with respect to any transaction in or affecting interstate or foreign commerce œ (1) a signature, contract, or other record relating to such transaction may not be denied legal effect, validity, or enforceability solely because it is in electronic form.

15 U.S.C. ‾ 7001(a). This statute definitively resolves the issue,
left open by the district court, <u>Campbell</u>, 321 F. Supp. 2d at 150,
as to whether an e-mail agreement to arbitrate is unenforceable
under the FAA because it does not satisfy the FAA's "written
provision" requirement, 9 U.S.C. ‾ 2. By its plain terms, the E-
Sign Act prohibits any interpretation of the FAA's "written
provision" requirement that would preclude giving legal effect to
an agreement solely on the basis that it was in electronic form.
<u>See</u> <u>Specht</u> v. <u>Netscape Communications Corp.</u>, 306 F.3d 17, 26 n.11
(2d Cir. 2002).

Having clarified that the choice of mass e-mail is not
determinative of the appropriateness of the notice, we consider the
relevance of that means of notification within the context of
General Dynamics's workplace routines and conventions. We start by
inquiring whether the e-mail announcement was typical in comparison
to other significant communications transmitted to the plaintiff
over the course of his employment.

The history of past communication at this workplace
establishes that e-mails were a preferred method of communication.
The plaintiff, however, takes the position that, although
electronic communication via the company's intranet may have been
"the most widely used method of communicating with co-workers," e-
mail was not the usual means utilized by the company to handle
personnel matters. Rather, any significant alterations to the

employment relationship (including his hiring and termination) were memorialized in conventional writings that required a signature on a piece of paper, which was then placed in a personnel file. General Dynamics does not dispute these facts, but counters that the plaintiff performed most of his work on a computer and that his supervisor had informed him that company policies were accessible on the intranet.

We find the company's proffer wanting. Conspicuously absent is the identification of any other instance in which the company relied upon either an e-mail or an intranet posting to introduce a <u>contractual</u> term that was to become a condition of continued employment. We think that there is a qualitative difference between such a term and a policy that informs the employment relationship but imposes no enforceable obligations upon either party.

This defect weighs all the more heavily because it could so easily have been remedied. One way that General Dynamics could have set this particular communication apart from the crowd would have been to require a response to the e-mail. Instead, the company opted for a "no response required" format. Within the context of this particular employment relationship, in which significant personnel matters historically had been transacted via signed documents, this choice disguised the import of the communication. Signing an acknowledgment or, in a more modern

-24-

context, clicking a box on a computer screen, are acts associated with entering into contracts. Requiring an affirmative response of that sort would have signaled that the Policy was contractual in nature. Although we do not hold that the requirement of an affirmative response is necessary to satisfy section 12212 in every circumstance, the lack of that level of inexpensively obtainable formality made it less likely that the communication would spark a realization that the new Policy marshaled binding effects.

The upshot is that the record supports the conclusion that e-mail was a familiar format for many forms of intra-office communication, but it does not suggest that e-mail was a traditional means either for conveying contractually binding terms or for effectuating waivers of employees' legal rights. Given that circumstance, we cannot say that delivery of an e-mail heralding the birth of a new policy would raise a red flag vivid enough to cause a reasonable employee to anticipate the imposition of a legally significant alteration to the terms and conditions of his employment. Therefore, within the context of this case, the e-mail communication, in and of itself, was not enough to put a reasonable employee on inquiry notice of an alteration to the contractual aspects of the employment relationship.

This leaves the content of the communication, which had two components: the e-mail announcement and the ancillary documents that were accessible via computer link. We take the

communication as the employer structured it and, therefore, focus on the content of the e-mail announcement. General Dynamics relied upon that broadcast to introduce the Policy, and it is clear beyond peradventure that its effectiveness vel non in unveiling the nature and significance of the Policy is relevant to whether a reasonable person should be charged with inquiry notice of the mandatory arbitration agreement contained in the Policy. Upon close perscrutation, we conclude that its text did not carry the burden of providing fair warning that showing up for work the next day would result in a waiver of important rights.

One fundamental flaw is that the e-mail did not state directly that the Policy contained an arbitration agreement that was meant to effect a waiver of an employee's right to access a judicial forum. Nor did the e-mail contain anything to put the recipient on inquiry notice of that possibility by conveying the Policy's contractual significance. While explicitness may not be a sine qua non of an effective notice, it would have gone a long way toward meeting the employer's burden.

A second flaw relates to tone and choice of phrase. While the Policy itself spoke in clear, contractual language (e.g., "continuation of employment by an individual shall be deemed [an] acceptance" of the provisions of the Policy, that "[t]he mutual obligations set forth in [the] Policy shall constitute a contract between the Employee and the Company," and that "[the] Policy shall

constitute the entire agreement between the Employee and the Company for the resolution of covered Claims"), the e-mail announcement descanted in an entirely different vocabulary, downplaying the obligations set forth in the Policy. The text of the e-mail did not state either that the Policy contained contractually binding terms or that the employer would treat continued employment as an acceptance of those terms. Perhaps most telling, the e-mail's description of the four-step dispute resolution procedure omitted the crucial fact that, as a matter of law, the regimen would become an employee's exclusive remedy for employment-related claims of virtually every kind and description. Finally, while the e-mail announcement communicated the notion that arbitration is a kinder, gentler alternative to litigation and had the company's blessing, it did not suggest that arbitration was to become mandatory and thereby extinguish an employee's access to a judicial forum as a means for dispute resolution. So viewed, the contents of the e-mail do not constitute a very sturdy reed upon which to rest a finding of inquiry notice.

General Dynamics makes much of the fact that the e-mail announcement stated that the Policy was "an essential element of [the] employment relationship" and requested the recipient to "review the enclosed materials carefully." Although these statements would indicate to a reasonable person that the employer regarded the Policy as important, they do not in and of themselves

elucidate (or even intimate) the imposition of a mandatory agreement to arbitrate.[7] <u>Cf.</u> <u>Patterson</u> v. <u>Tenet Healthcare, Inc.</u>, 113 F.3d 832, 835 (8th Cir. 1997) (noting that terms such as "I agree," "I accept," and "condition of employment" distinguish legally significant communications from non-binding policies by imparting to an employee that the communication constitutes an enforceable contract). Here, the request to read certain materials did little to provide notice of a waiver of the right to access a judicial forum because the accompanying description of those materials failed to convey their legal significance.

To be blunt, the e-mail announcement undersold the significance of the Policy and omitted the critical fact that it contained a mandatory arbitration agreement. The result was that a reasonable employee could read the e-mail announcement and conclude that the Policy presented an optional alternative to litigation rather than a mandatory replacement for it. Because that primary communication lends itself to such a conclusion œ

---

[7]General Dynamics suggests that its request that the recipient "review the enclosed materials carefully" automatically charges the plaintiff with notice of the contents of the linked documents. In support of this line of reasoning, it cites <u>Rosenberg</u> for the proposition that "[i]f [the employer] had provided the rules to [the employee] but [the employee] did not read them, that would not save her." <u>Rosenberg</u>, 170 F.3d at 21 n.17. In <u>Rosenberg</u>, however, there was no dispute that the plaintiff had signed a contract and thus manifested her assent to be bound by its terms; it was on that basis that the court observed that she would have been obligated to comply with those terms, so long as they had been provided to her as promised. Thus, <u>Rosenberg</u> is inapposite on this point.

rather than cluing in the reader by including a simple statement of the kind contained in the Policy itself that "[t]he mutual obligations set forth in [the] Policy shall constitute a contract between the Employee and the Company" œ we conclude that it failed to put the recipient on inquiry notice of the unilateral contract offer contained in the linked materials.

Our journey is not yet at an end. There is a final circumstance under which the communication might have conveyed sufficient notice. The e-mail announcement did alert employees to the existence of a new employee handbook containing the Policy. This adds a new dimension to the employer's argument.

Personnel handbooks do not have uniform legal significance; the import of such a handbook varies according to a multitude of factors. In Massachusetts, for example, the enforceability of an employee handbook as a contract depends upon a host of considerations, including its content and the circumstances of its distribution. See O'Brien v. New Eng. Tel. & Tel. Co., 664 N.E.2d 843, 847-49 (Mass. 1996). In some instances, such handbooks may meet the requirements for the formation of a contract. See, e.g., id. at 849. In other instances, they do not. See, e.g., Weber v. Cmty. Teamwork, Inc., 752 N.E.2d 700, 714 (Mass. 2001); Jackson v. Action for Boston Cmty. Dev., 525 N.E.2d 411, 415 (Mass. 1988).

If a reasonable employee of General Dynamics would have known, given prior dealings between the company and its work force, that personnel handbooks operated as the functional equivalents of contracts, the introduction of a new policy and the fact of its promulgation in a reissued handbook might have sufficed to alert such an employee that the handbook contained legally binding terms. Here, however, General Dynamics has produced no evidence that any historical use of personnel handbooks in the workplace would have suggested that the reissued handbook carried contractual significance. Therefore, we conclude that the company's promulgation of a new handbook, without more, does not support a finding of adequate notice.

In the last analysis, the question is whether the announcement provided minimally sufficient notice by signaling to a reasonable employee that the Policy was a contractual instrument whose terms would be deemed accepted upon continued employment (and, thus, placed the employee on inquiry notice of the contemplated waiver of his legal rights). Having examined the totality of the circumstances œ the method, content, and context of the communication œ we answer that question in the negative.

We caution that this holding should not be read as a general denunciation of e-mail as a medium for contract formation in the workplace. This is a close case, and our holding here is tied to its specific facts. Moreover, our analysis has revealed

several simple steps readily available to the employer that likely would have ensured the adequacy of the notice. In <u>Rosenberg</u>, 170 F.3d at 19, we observed that an employer who takes a barebones approach to affording notice runs the risk that its efforts will fall short. This case illustrates the accuracy of that observation.

## V.  CONCLUSION

We need go no further. Under the peculiar circumstances of this case, we cannot say that the e-mail announcement would have apprised a reasonable employee that the Policy was a contract that extinguished his or her right to access a judicial forum for resolution of federal employment discrimination claims. In the absence of minimally sufficient notice, we conclude that it would not be appropriate to enforce the Policy's purported waiver of the right to litigate ADA claims. Consequently, the district court did not err in denying the motion to stay the litigation and compel recourse to an arbitral forum.

**<u>Affirmed</u>**.

**— Concurring Opinion Follows —**

      **LIPEZ**, **<u>Circuit Judge</u>**, **concurring**. Judge Selya's application of our decision in <u>Rosenberg</u> v. <u>Merrill Lynch, Pierce, Fenner & Smith, Inc.</u>, 170 F.3d 1 (1st Cir. 1999), to the facts of this case is exemplary. I write separately for the sole purpose of affirming my support for that precedent.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS AT BOSTON

CAROL L. THOMAS,

    Plaintiff

-v-                  CIVIL NO. 05-10726 PBS

DRESSER, INC. – MASONEILAN

    Defendant

## Affidavit of **Carol L. Thomas**

I, Carol L. Thomas, being on oath depose and say as follows:

1. I am over the age of 18 and understand the meaning and obligations of an oath. Unless specifically stated herein, the statements I make in this affidavit are based on my personal knowledge.

2. I was employed by Dresser, Inc., as the Human Resources Specialist for the Avon Operations of Dresser Flow Solutions until 8/4/04. I began my employment on 8/16/90.

3. Dresser Industries, Inc., merged with the Halliburton Company in 1998. Halliburton had a benefit option entitled the Halliburton Dispute Resolution Program ("DRP") that was available to all non-bargaining unit employees. Dispute Resolution Booklets were mailed to all employees and an information session was conducted to present the details of the program.

4. All employees were invited to attend these sessions however, only the employees hired **after** the merger were required to sign the DRP agreement **and to participate in the program.**

5. As the H.R. Specialist, I was asked by a representative from the Corporate Office to compile a report listing the names, titles and dates of hire of all employees hired after the merger and I was provided with enough booklets for these

employees. I was further instructed to send a copy of the DRP booklet and the agreement form to these employees for signature. I was also given a template to use for future offer letters which included a statement requiring all new hires to sign the DRP form as a condition of employment.

6. A copy of this signed Agreement was placed in the files of the new employees.

7. On April 10, 2001, Dresser, Inc., adopted the Halliburton Dispute Resolution Program concept and later informed employees that this option was still available if needed.

8. On August 3, 2004, the day before my termination of employment, Mike Dills, V.P. of Human Resources encouraged me to call Robbie Marshall (the DRP contact) to "chat" about my situation. I refused because I did not want to risk waiving my legal rights.


Executed under the penalties of perjury on this 24th day of June, 2005.


Carol L. Thomas